UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-23249-CIV-ALTONAGA/Reid

MULTIPHONE LATIN AMERICA INC.,

    Plaintiff,

v.

MILLICOM INTERNATIONAL
CELLULAR S.A.,

    Defendant.

_____/

## AMENDED COMPLAINT

**COMES NOW** Plaintiff, Multiphone Latin America Inc. ("Multiphone"), by and through its undersigned counsel, and sues Defendant, Millicom International Cellular S.A. ("Millicom"), and alleges:

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

2. Plaintiff is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

3. Defendant is a Luxembourg société anonyme (public limited liability company) with its principal place of business in Luxembourg.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District and the Contract between the Parties explicitly recognizes this Court to be the proper venue.

## GENERAL ALLEGATIONS

### *The Parties and Their Business Relationship*

5. Multiphone is a software development company specializing in international telecommunications applications and services.

6. Millicom is a multinational telecommunications company that provides mobile and cable services in Latin America through its "Tigo" brand.

7. In April 2016, Millicom approached Multiphone to discuss developing a mobile application that would enable Millicom's subscribers in the United States, Canada, and Spain to make international calls and purchase prepaid airtime services.

8. Millicom represented that it would provide comprehensive marketing support, technical infrastructure including API and VPN access, operational assistance in its Latin American markets, and licensing rights to use its trademarks and branded materials.

### *The Master Software as a Service Agreement*

9. After extensive negotiations lasting approximately one year, on April 10, 2017, the parties executed a Master Software as a Service Agreement (the "Agreement"). A true and correct copy is attached hereto as **Exhibit 1**.

10. Under the Agreement, Multiphone agreed to develop, host, and maintain mobile applications called "Tigo Internacional" for iOS and Android platforms.

11. The Agreement required Multiphone to: (a) develop and launch the application by August 1, 2017; (b) maintain customer support services; (c) implement security protocols and data protection measures; and (d) handle payment processing and reconciliations.

12. The Agreement required Millicom to: (a) Provide marketing support to promote the application (Section 4.1(a)); (b) Grant licenses to use Millicom's trademarks and copyrighted materials (Section 13.1); (c) Provide local operational support in Bolivia, Colombia, El Salvador, Guatemala, Honduras, and Paraguay (Section 2 and Annex D); (d) Supply VPN and API access for network integration (Section 4.1(e)); and (e) Share revenue according to the formula in Annex C (50% to each party after costs).

13. Section 10 of the Agreement imposed mutual confidentiality obligations, requiring both parties to protect "Confidential Information" as defined therein, including "business plans, software programs, systems design or subroutines, source or object code, algorithms, improvements, inventions, technology, formulae, discoveries, designs, ideas, processes, techniques, know-how, data, models, concepts, methods, prototypes, or other matter."

### *Development and Features of the Multiphone Application*

14. Multiphone invested substantial resources, exceeding $2 million, in developing a sophisticated mobile application with innovative features including: (a) Dual calling technology: Ability to make calls via VoIP or local access numbers; (b) Streamlined registration: Phone number and SMS verification system for quick access; (c) Intelligent call routing: Automatic insertion of pauses and B-numbers for seamless international calling; (d) Account management system: In-app browser interface for recharging and account services; (e) Transaction tracking: Comprehensive call history with cost tracking; Special discounted packages for Tigo users created by Multiphone; and (g) Multi-platform support: Native applications for both iOS and Android.

15. Before the application's launch, Millicom conducted a detailed review of Multiphone's application, documenting its features, user interface, and functionality. This review included:

    a. Screenshots of every major feature

    b. Detailed analysis of the registration process

    c. Documentation of the account management system

    d. Specific change requests showing Millicom's deep understanding of the application's architecture

16. Multiphone successfully launched the application on August 1, 2017, incorporating Millicom's requested changes and meeting all technical requirements.

17. Since the launch, Multiphone has continuously performed all its obligations under the Agreement.

### *Millicom's Breaches*

18. Beginning in August 2017 and continuing through the present, Millicom has materially breached the Agreement through the following specific failures:

19. Marketing Support Breach: Despite Section 4.1(a) requiring marketing support, Millicom:

    a. Failed to include the application in marketing campaigns

    b. Refused to promote the application on Tigo websites in Guatemala, Honduras, and El Salvador

    c. Declined to allocate any of the promised marketing budget

    d. Failed to implement the co-marketing strategies outlined in pre-contract discussions

20. Technical Infrastructure Breach: In violation of Section 4.1(e), Millicom continuously failed to:

    a. Provide marketing support necessary to promote the App to Subscribers and prospective Subscribers;

    b. Provide access numbers in several countries where the Operators function;

    c. Provide direct interconnection, including but not limited to VPNs and APIs, to the countries where the Operators function;

21. Operational Support Breach: Despite obligations under Section 2 and Annex D, Millicom:

    a. Failed to designate local representatives in many of the specified countries

    b. Failed to establish promised customer service escalation procedures

### *Millicom's Development of Competing Application*

22. In June 2022, Millicom launched "Tigo Internacional Recargas," a competing application with substantially similar functionality to the application Multiphone developed.

23. A comparison of the applications reveals that Millicom's "Tigo Internacional Recargas" copied Multiphone's application feature-for-feature, including:

    a. Identical core functionality: Mobile recharges of top-ups and discount bundles

    b. Same registration process: Phone number and SMS verification

    c. Identical geographical focus: Targeting diaspora users in the USA sending recharges to Guatemala, Honduras, El Salvador, and Nicaragua

    d. Similar user interface with guided steps and transaction history features

    e. Same branding elements: signature blue and white color scheme

24. Millicom deliberately concealed the existence and development of this competing application from Multiphone, despite having ongoing contractual obligations and a duty to disclose material information affecting the partnership.

25. The competing application targets the same customer base and offers identical services, effectively eliminating Multiphone's ability to generate revenue under the Agreement.

*Millicom's Termination of the Agreement and Fraudulent Concealment*

26. Throughout the contractual relationship, Millicom had a duty to disclose material facts affecting the partnership, including any plans to develop competing services or terminate the Agreement.

27. Millicom fraudulently concealed its true intentions by:

   a. Continuing to accept Multiphone's performance under the Agreement while secretly developing a replacement

   b. Making periodic communications suggesting continued partnership while planning termination

   c. Withholding information about its competing application development

   d. Preventing Multiphone from discovering the scheme through deliberate misdirection

28. On July 12, 2023, Alfonso Puente, Transaction Director and Head of Tigo USA, writing on behalf of Millicom, sent an email to Multiphone finally revealing what had been concealed for years - Millicom's decision to terminate the Agreement and replace Multiphone's application.

29. In this email, Mr. Puente stated that Millicom would:

   a. Terminate the contract and the Tigo Internacional app administered by Multiphone;

    b. Concentrate clients in a single app;

    c. Integrate LDI voice into the new Tigo app with or without Multiphone

30. This communication revealed that Millicom had been operating in bad faith throughout the contractual relationship, using the partnership to extract Multiphone's innovations while secretly developing a replacement application.

31. Due to Millicom's fraudulent concealment, Multiphone could not have discovered the full extent of Millicom's deception until this July 2023 revelation.

### *Damages*

32. As a direct and proximate result of Millicom's breaches and fraudulent concealment, Multiphone has suffered damages including:

    a. Lost revenue of at least $11 million based on projected earnings

    b. Development costs exceeding $2 million

    c. Ongoing operational costs of $50,000 per month since August 2017

    d. Lost business opportunities due to resource allocation

    e. Inability to seek alternative partnerships due to Millicom's concealment

### **COUNT I - BREACH OF CONTRACT**

33. Multiphone realleges paragraphs 1-32.

34. On April 10, 2017, the parties executed a Master Software Service Agreement (the "Agreement").

35. The Agreement is a valid and enforceable contract set to renew annually after the initial two-year term unless either party provides termination notice of at least 30 days.

36. Multiphone has performed all conditions precedent and all obligations under the Agreement.

37. Millicom materially breached the Agreement by:

   a. Failing to provide marketing support as required by Section 4.1(a)

   b. Failing to provide VPN and API access as required by Section 4.1(e)

   c. Denying use of trademarks and branded materials as required by Section 13.1

   d. Failing to provide operational support as required by Section 2

   e. Using Multiphone's Confidential Information such as App architecture, pricing structure, and interface to develop a competing application in violation of Section 10

38. Specifically, regarding the confidentiality breach, Section 10 of the Agreement prohibits use of Confidential Information for purposes outside the Agreement. Multiphone disclosed to Millicom:

   a. Technical specifications for the mobile application architecture as designed and developed by Multiphone

   b. User interface designs and user experience workflows

   c. Customer acquisition strategies and marketing approaches developed by Multiphone

   d. Pricing models and revenue optimization techniques

   e. Innovative discount bundles concept developed by Multiphone

39. Millicom violated Section 10 by using this Confidential Information to develop its "Tigo Internacional Recargas" competing application, as evidenced by the identical features, functionality, and technical architecture.

40.     These breaches are continuing and ongoing, with Millicom continuing to refuse performance and continuing to use Multiphone's Confidential Information in its competing application.

41.     As a direct and proximate result of Millicom's breaches, Multiphone has suffered damages exceeding $11 million.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages exceeding $11 million, injunctive relief prohibiting further use of Confidential Information, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT II - VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

42.     Multiphone realleges paragraphs 1-32.

43.     This action involves consumer transactions as defined by Florida Statutes § 501.203(8), as the parties engaged in trade and commerce involving the sale, advertising, and distribution of goods and services.

44.     Millicom engaged in trade or commerce within the meaning of FDUTPA by conducting substantial business activities in Florida through its agreement with Multiphone, a Florida corporation.

*Deceptive Acts with Particularity*

45.     Millicom made several specific material misrepresentations to induce Multiphone to enter the Agreement and continued to make misrepresentations after the Parties entered the Agreement:

a.     On or about April 20, 2016, Humberto Itriago, Director of Multiphone, met with Millicom representatives who stated that Millicom would provide comprehensive

        marketing support through all Tigo channels to promote the application. These representations were made with the intent to induce Multiphone to enter into the Agreement and Millicom made these representations knowing that they either could not fulfill these promises or never intended to fulfill these promises.

b.   On or about May 12, 2020, Estuardo Figueroa International Business Director for Millicom, informed Multiphone that Millicom was actively working on a digital campaign to promote the app, but this digital campaign never occurred.

c.   On or about August 2017, after Multiphone had informed Millicom that it has still not received a detailed marketing and sales plan as required by the Agreement, Millicom took this notification to mean that Multiphone was requesting the early termination of the Agreement.

d.   On or about August 17, 2017, Multiphone emailed Estuardo Figueroa informing Millicom that Multiphone was fully committed to the partnership and was simply requesting Millicom to abide by their contractual obligations. Figueroa responded to this email by stating that Millicom was glad to hear that Multiphone did not intend to terminate the contract and promised to provide a detailed sales and marketing plan shortly. The marketing and sales plan was emailed to Multiphone that day, but Millicom failed to execute that plan.

e.   On or about July 12, 2023, Alfonso Puente of Millicom admitted that it was developing a competing application and seeking the transfer of customers into a single application

46.   These representations were false when made, as evidenced by:

    a.    Millicom's complete failure to meet its marketing obligations despite assuring Multiphone that it would cure all breaches of its marketing obligations.

    b.    The fact that from August 2017 through present, Millicom failed to promote the Tigo Internacional app on its websites in some of the promised Latin American countries despite promoting other services extensively.

    c.    Millicom's simultaneous development of its own competing application while under contract with Multiphone as evidenced by the Alfonso Puente email.

### *Concealment of Material Facts*

47.    Millicom engaged in deceptive concealment by deliberately hiding its development of the "Tigo Internacional Recargas" competing application while continuing to accept Multiphone's performance and innovations:

    a.    Millicom never disclosed during the Agreement term that it was developing a competing application with identical functionality.

    b.    The "Tigo Internacional Recargas" app, launched in June 2022, contains the exact same features as Multiphone's app:

        (1)    Phone number and SMS verification for registration

        (2)    Mobile recharges of top-ups and discount bundles

        (3)    Identical user interface with guided steps and transaction history

        (4)    Same geographical focus on Guatemala, Honduras, El Salvador, Nicaragua

        (5)    Identical blue and white Tigo branding and logos

    c.    Millicom obtained these features through its detailed review of Multiphone's application, documented in its own screenshots and analysis conducted before launch.

    d.    The similarities between the applications have mislead consumers into believing that the application will provide the same features at the same price to the consumer because the consumer is likely to believe that it is developed under the same house. In one instance, on or about October 25, 2022, a client reported to Multiphone that a recharge never reached its destination. The client mistakenly used Tigo's new application but reported the discrepancy to Multiphones call center showing that consumers have been misled and or confused due to the similarities of the applications and believed that the applications were under the same brand.

### *Unfair Practices*

48.    Millicom engaged in unfair practices that offend established public policy and are immoral, unethical, oppressive, and unscrupulous:

    a.    Exploiting its dominant market position as the Tigo brand owner to extract Multiphone's proprietary technology while withholding promised support.

    b.    Using the confidential information obtained through the Agreement - including technical specifications, user interface designs, and the discount bundle concept created by Multiphone - to develop its competing application.

    c.    Preventing Multiphone from succeeding in the market by denying access to VPN and API connections needed for integration, withholding access to the some of the Latin American markets promised, and blocking promotion on Tigo websites where customers would naturally look for the service.

    d.    Multiphone has market interests in several countries including but not limited to: Honduras, Nicaragua, Panama, Guatemala, and El Salvador as evidenced by its explicit contracts with telecommunication carriers in these Countries.

e.  Multiphone's market interests have been directly damaged by Millicom secretly developing a competing App that would undermine the express contracts Multiphone had with various markets in these Countries.

49. These practices cause substantial injury to consumers by limiting competition in the international calling services market, depriving consumers of innovative services that would have been available had Millicom not undermined Multiphone, and allowing Millicom to monopolize services that should have been competitively offered.

### *What Millicom Obtained Through Its Deception*

50. As a direct result of its deceptive and unfair practices, Millicom obtained:

a.  Multiphone's complete application architecture and source code through the detailed review process

b.  The innovative discount bundle concept and pricing model developed by Multiphone

c.  User interface designs and user experience workflows worth over $2 million in development costs

d.  Market intelligence and customer behavioral analysis developed by Multiphone

e.  The ability to launch its own "Tigo Internacional Recargas" app in 2022 without paying for the development work performed by Multiphone

51. The substantial similarity between the applications demonstrates that Millicom could not have developed its competing application without the confidential information and trade secrets obtained through its deceptive practices.

52. Millicom's FDUTPA violations were willful, as evidenced by:

a.  The systematic nature of the deception spanning from 2017 to 2023

  b. The deliberate concealment of the competing application development.

  c. The July 12, 2023, email from Alfonso Puente finally admitting Millicom would terminate the contract and the Tigo Internacional app administered by Multiphone to concentrate clients in a single app.

53. As a direct and proximate result of Millicom's violations of FDUTPA, Multiphone has suffered actual damages exceeding $11 million, including lost revenues, development costs, and ongoing operational expenses.

54. Pursuant to Florida Statutes § 501.2105, Multiphone is entitled to recover its reasonable attorneys' fees and costs.

  **WHEREFORE**, Plaintiff respectfully requests that this Court:

  A. Enter judgment in favor of Plaintiff and against Defendant on all Counts;

  B. Award compensatory damages in an amount to be proven at trial, but not less than $11 million;

  C. Enter injunctive relief prohibiting Defendant from further use of Plaintiff's Confidential Information;

  D. Award Plaintiff its reasonable attorneys' fees and costs pursuant to Florida Statutes § 501.2105;

  E. Award pre-judgment and post-judgment interest;

  F. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR NON-JURY TRIAL

Plaintiff demands a non-jury trial on all issues so triable.

DATED: September 10, 2025

Respectfully submitted,

By:*/s/ David Alvarez*
David Alvarez, Esquire
FBN: 1054426

By: */s/ Robert Twombly*
Robert Twombly, Esquire
FBN: 0060127

**WHITE & TWOMBLY, P.A.**
*Attorneys for Plaintiff*
9999 NE 2nd Avenue, Suite 306
Miami Shores, Florida 33138
Telephone: (786) 502-2038
david@whitetwombly.com
robert@whitetwombly.com
paralegalryt@whitetwombly.com
katherine@whitetwombly.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 10th day of September 2025, a true and correct copy of the foregoing was filed with the Clerk of Court using CM/ECF, which will send electronic notice to all counsel of record.

By:*/s/David Alvarez*
David Alvarez, Esquire
FBN: 1054426